**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| EMG TECHNOLOGY, LLC | § | |
| | § | |
| v. | § | No. 6:12cv259 |
| | § | (Consolidated—Lead Case) |
| CHRYSLER GROUP, LLC | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction order construes the disputed claim terms of U.S. Patent No. 7,441,196. Plaintiff filed an opening brief (Doc. No. 120), Defendants filed a response (Doc. No. 124), and Plaintiff filed a reply (Doc. No. 127).[1] On June 20, 2013, the Court held a claim construction hearing and heard argument. For the following reasons, the Court adopts the constructions set forth herein. A summary of the final constructions is included with this order as Attachment A.

---

[1] References to docket numbers herein shall be to Case No. 6:12-CV-259 unless otherwise indicated.

**Table of Contents**

I.  BACKGROUND ................................................................................................... 3

II.  LEGAL PRINCIPLES ........................................................................................ 3

III.  CONSTRUCTION OF DISPUTED TERMS ...................................................... 6

    A.  "webpage" and "web page" ......................................................................... 6

    B.  "sister site" ................................................................................................ 10

    C.  "exclusive to a separate single navigation option" ............................... 10

    D.  "unique input" and "associated with a specific unique input" ............ 17

    E.  "to navigate to the web page" .................................................................. 21

    F.  "to navigate to the sister site" ................................................................ 24

    G.  "to generate a sister site" ........................................................................ 25

    H.  "reformatted" ........................................................................................... 30

    I.  "the two-dimensional layer in a form of a navigation matrix" ............ 31

    J.  "manipulating a region of the screen" ................................................... 32

IV.  CONCLUSION ................................................................................................. 33

# I.  BACKGROUND

This is a patent infringement suit. Plaintiff alleges infringement of U.S. Patent No. 7,441,196 ("the '196 Patent") by Defendants Google Inc., Expedia, Inc., and Costco Wholesale Corporation. The '196 Patent, titled "Apparatus and Method of Manipulating a Region on a Wireless Device Screen for Viewing, Zooming and Scrolling Internet Content," was filed on March 13, 2006, and issued on October 21, 2008. The '196 Patent is a continuation of U.S. Patent No. 7,020,845 ("the '845 Patent"), which is a continuation-in-part of U.S. Patent No. 6,600,497 ("the '497 Patent").

In general, the '196 Patent relates to providing a simplified navigation interface for a web page. The Abstract of the '196 Patent states:

> A method and apparatus of simplified navigation. A web page is provided having a link to a sister site. The sister site facilitates simplified navigation. Pages from the sister site are served responsive to actuation of the sister site link. In one embodiment, the sister site includes matrix pages to permit matrix navigation.

The Court previously construed various terms in the '196 Patent in *EMG Technology, LLC v. Dr. Pepper Snapple Group Inc., et al.*, first in a provisional claim construction order (No. 6:10-CV-536, Doc. No. 296 (Apr. 3, 2012) (Davis, J.) ("*Dr. Pepper Provisional*")), and then in a final claim construction order (No. 6:10-CV-536, 2012 WL 3263588, Doc. No. 311 (Aug. 8, 2012) (Davis, J.) ("*Dr. Pepper Final*")).

# II.  LEGAL PRINCIPLES

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The purpose of claim construction is to resolve the meanings and technical scope of claim terms. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

The claims of a patent define the scope of the invention. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). They provide the "metes and bounds" of the patentee's right to exclude. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Accordingly, claim construction begins with and "remain[s] centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Claim terms are normally given their "ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

The best guide for defining a disputed term is a patent's intrinsic evidence. *Teleflex*, 299 F.3d at 1325. Intrinsic evidence includes the patent's specification and the prosecution history. *Id.*

The claims are part of the specification. *Markman*, 52 F.3d at 979. The context in which a term is used in the claims instructs the term's construction. *Phillips*, 415 F.3d at 1314; *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("[T]he language of the claim frames and ultimately resolves all issues of claim interpretation."). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.

In addition to the claims, the specification's written description is an important consideration during the claim construction process. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The written description provides further context for claim terms and may reflect a patentee's intent to limit the scope of the claims. *Watts v. XL Sys., Inc.*,

232 F.3d 877, 882 (Fed. Cir. 2000). But care must be taken to avoid unnecessarily reading limitations from the specification into the claims. *Teleflex*, 299 F.3d at 1326; *see also Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims."). "[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117; *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

The prosecution history is also part of the intrinsic evidence. *Phillips*, 415 F.3d at 1317. It "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* Statements made during the prosecution of the patent may limit the scope of the claims. *Teleflex*, 299 F.3d at 1326.

Finally, the Court may rely on extrinsic evidence to aid with understanding the meaning of claim terms. *Markman*, 52 F.3d at 981. Extrinsic evidence includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 980. Extrinsic evidence is generally less useful, *Phillips*, 415 F.3d at 1317, and it should not be relied on when it contradicts the intrinsic evidence. *Markman*, 52 F.3d at 981.

Prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex.

June 21, 2006). The Court nonetheless conducts an independent evaluation during claim construction proceedings. *See, e.g., Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589–90 (E.D. Tex. 2002); *Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005); *Negotiated Data Solutions, Inc. v. Apple, Inc.*, No. 2:11-CV-390, 2012 WL 6494240, at *5 (E.D. Tex. Dec. 13, 2012).

## III. CONSTRUCTION OF DISPUTED TERMS

The disputed terms appear in Claims 1, 9, 25, and 58.[2] At the beginning of the June 20, 2013 claim construction hearing, the Court provided the parties with the Court's preliminary proposed construction for the disputed terms on which the parties intended to present oral argument. These preliminary proposed constructions, which the Court provided to facilitate discussion and to focus the parties' arguments, are set forth in each section below. The Court recessed for nearly one hour, before the start of oral argument on the disputed terms (*see* Doc. No. 137 at 1–2), to allow the parties to consider the Court's preliminary proposals and to confer with one another. The parties reached agreements on certain terms, as set forth herein.

### A. "webpage" and "web page"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a document on the world wide web" | No construction is required—plain and ordinary meaning |

(Doc. No. 114-1 at 1, Doc. No. 114-2 at 17).

The Court construed this term to mean "a document on the world wide web" by agreement of the parties in the *Dr. Pepper* case. *Dr. Pepper Final* at 5. The parties elected not to present oral argument on this term at the June 20, 2013 claim construction hearing in the present

---

[2] On September 6, 2011, the U.S. Patent and Trademark Office issued an Inter Partes Reexamination Certificate that contained amendments to Claims 1, 9, 25, and 58 of the '196 Patent (*see* Doc. No. 1-3). All references in this order to these claims are references to the amended claims in the reexamination certificate.

case (*see* Doc. No. 135 at 2). The Court therefore did not provide the parties' with a preliminary proposed construction.

(1)  The Parties' Positions

Plaintiff submits that this Court's prior construction "is supported by the Microsoft Press Computer Dictionary (4th Ed. 1999)" (Doc. No. 120 at 9). Plaintiff urges that this term requires construction because in Defendants' invalidity contentions, Defendants interpret this term to refer to "documents stored on a user's local computer or mobile device" (Doc. No. 120 at 9).

Defendants respond that "web page" is "a term common to the modern vernacular, and nothing in EMG's opening brief suggests that the patentee ever intended the term to have an uncommon meaning" (Doc. No. 124 at 29). Defendants argue that Plaintiff's proposal is "overbroad and unhelpful," particularly because "while all web pages may be documents, it is not true that all documents are web pages" (Doc. No. 124 at 29). As another example, Defendants submit that "if a Microsoft Word document is attached to an email that is accessible by a web browser, the document does not become a 'web page'" (Doc. No. 124 at 29–30). Defendants further submit that "[t]here is no dispute that the 'web' in 'web page' refers to the 'world wide web'" (Doc. No. 124 at 29). Finally, Defendants urge that because the Court in *Dr. Pepper* simply adopted the parties' agreed-upon construction, the Court in *Dr. Pepper* did not rule upon any dispute as to this term (Doc. No. 124 at 30). Defendants conclude that *Dr. Pepper* does not demonstrate that any construction is required (Doc. No. 124).

Plaintiff replies that "[a] jury will not confuse a Word document attached to an email for a web page in the context of the claims" because "the claims are directed to navigating the Internet using a simplified navigation interface, not sending email attachments" (Doc. No. 127 at 1).

The parties agreed to submit this disputed term on the briefs, without oral argument (*see* Doc. No 135 at 2).

(2)  Analysis

The claims at issue recite, in relevant part, "a webpage in a hypertext markup language (HTML) format . . . ." Figure 2A is disclosed as being "an exemplary web page having a sister site link" ('196 Patent at 3:12) and is reproduced here:



FIG. 2A

The '196 Patent uses the word "document" four times:

> A hypertext markup language (HTML) page 40 is transcoded by a transcoder 30 to yield, for example, an XML page 42 to which a *document* type definition (DTD) 38 is applied. The DTD 38 specifies the rules for the structure of the resulting XML page. The XML page is then reformatted using extensible style language (XSL) 34 to corresponding format data 32. XSL is not currently supported by all standard browsers. Thus, after formatting, the XML *document* is translated to an extensible hypertext markup language (XHTML) *document* for subsequent display by a client side browser on display 52.

'196 Patent at 3:23–33 (emphasis added). On balance, the word "document" clarifies the meaning of the constituent term "page" and will be sufficiently clear in the context of the surrounding claim language, the specification, and the figures.

In *Dr. Pepper*, while addressing the term "sister site," the Court discussed "websites" with the understanding that a website is something on a network rather than something stored locally:

> In distinguishing [the] Dolan [reference during prosecution], [Plaintiff] argued that Dolan failed to teach a sister site because the related navigation file was merely a locally stored file and thus not at a discrete location on the network. Thus, a sister site must be a site located on the network as opposed to a file that may only be accessed locally. Defendants do not dispute that a sister site is located on the network. Adding the "discrete location" limitation [proposed by the defendants in *Dr. Pepper*] without further context would only confuse the issue. To the extent that Defendants argue that discrete location means that a sister site must be separate from its related site, "related to *another* website" conveys this idea clearly and succinctly.

*Dr. Pepper Final* at 7. The Court in *Dr. Pepper* also noted that a web site is something comprised of web pages: "While a sister site may correspond to a webpage in the event that a website contains only a single webpage, a sister site should not always be so limited." *Dr. Pepper Final* at 6. The Court's findings in *Dr. Pepper* are persuasive here.

Finally, the word "Internet" is now in more common usage than the phrase "world wide web" and thus would likely be easier for a jury to understand. Also, the phrase "world wide web"

does not appear in the patent-in-suit, and the claims and the specification refer to the "Internet" rather than the "world wide web."

The Court therefore hereby construes **"webpage"** and **"web page"** to mean **"a document on an Internet website."**

**B. "sister site"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "a website that is related to another website" | "a site that provides for navigation of a related web page using a simplified navigation interface" |

(Doc. No. 114-1 at 2, Doc. No. 114-2 at 13).

The Court has previously construed this term to mean "a website that is related to another website." *Dr. Pepper Final* at 5–7.

At the June 20, 2013 hearing, the Court provided the parties with the following preliminary proposed construction: "a site that provides for navigation of a related website using a simplified navigation interface." Both sides were agreeable to the Court's preliminary proposed construction, which the Court therefore adopts.

The Court accordingly hereby construes **"sister site"** to mean **"a site that provides for navigation of a related website using a simplified navigation interface."**

**C. "exclusive to a separate single navigation option"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction required | "contains a single navigation option that is distinct from that of every other cell" |

(Doc. No. 114-1 at 3, Doc. No. 114-2 at 1).

At the June 20, 2013 hearing, the Court provided the parties with the following preliminary proposed construction: "there is a one-to-one relationship between cells and

navigation options." Plaintiff was agreeable, but Defendants responded that the Court's proposal failed to make clear that the one-to-one correspondence goes in "both directions," meaning that for every cell there is only one corresponding navigation option *and* for every navigation option there is only one corresponding cell.

(1)  The Parties' Positions

Plaintiff notes that "if the scope of the claims truly were limited as Defendants' propose, designing around the claims would require no more than adding two separate navigation options that lead to the same place" (Doc. No. 120 at 13). Plaintiff counters that the claim language requires simply that "each cell has its own navigation option" (Doc. No. 120 at 13). Plaintiff urges that Defendants' proposal to limit the claims to certain preferred embodiments should be rejected (Doc. No. 120 at 14).

Defendants respond that "Defendants' proposed construction contains two key pieces: (1) each cell must 'contain[] a single navigation option' (2) each single navigation option is 'distinct from that of every other cell'" (Doc. No. 124 at 5 (square brackets in original)). The parties appear to agree as to the first point, but as to the second, Defendants urge that "[t]he words 'exclusive' and 'separate' in this term require that each navigation option is associated with *one and only one* cell" (Doc. No. 124 at 5–6). Defendants also argue that "the specification of the '196 Patent only discloses and enables a system in which a navigation option is associated with one and only one cell. In Figures 9A through 9D and 10a through 10g, it is never the case that two cells actuate the same navigation option" (Doc. No. 124 at 6). Defendants further argue that Figure 2A, upon which Plaintiff relies, relates to an exemplary web page, *not* a sister site (Doc. No. 124 at 6). Finally, Defendants cite extrinsic dictionary definitions of "exclusive" and "separate" (Doc. No. 124 at 7–8).

Plaintiff replies that "Figure 2B, for example, illustrates that two navigation options such as 'Favorites' and 'Shopping' can lead to the same place" (Doc. No. 127 at 4). Plaintiff also argues that "it was well known to persons of ordinary skill in the art to use multiple navigation options on a single web page that lead to the same place" (Doc. No. 127 at 4).

(2)  Analysis

Claim 1 is representative and recites (emphasis added):

1.  A method of navigating the Internet, comprising:
    displaying on-line content accessed via the Internet, the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister site including a portion or a whole of content of the web page reformatted to be displayed and navigable through a simplified navigation interface on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone, the simplified navigation interface displayed in a form of a two-dimensional layer of cells from a plurality of layers and a plurality of cells, the two-dimensional layer in a form of a navigation matrix, each cell is a division of a screen and *exclusive to a separate single navigation option* associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;
    displaying a hyperlink on the sister site to navigate to the web page, or displaying a hyperlink on the web page to navigate to the sister site;
    receiving a user selection of one of the navigation options;
    forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;
    receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option; and
    manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.

Defendants have cited the Brief Summary of the Invention in the ancestor '497 Patent, which states: "A navigation matrix is displayed on a client node. The matrix *pairs each navigation option with an input* such that, for example, pressing a single key activates that navigation option." '497 Patent at 1:50–53 (emphasis added). Though the patentee's usage of the word "pairs" is probative, Defendants have not established that the claims of a continuation

application are necessarily limited by how the patentee summarized "the invention" in an ancestor patent having different claims.

The specification of the '196 Patent is less definitive, disclosing:

> In the context of a matrix page, one suitable segmentation is by cell, e.g., each cell corresponds to a region that may be independently brought into focus. The borders of the regions may or may not be visible on the web pages displayed. This segmentation facilitates tab, scroll, and zoom features described in more detail below. Alternatively, segmentation may be performed as part of a custom browser on custom browser nodes or may be instantiated as a hardware or firmware solution within, for example, the set top box.

'196 Patent at 3:2–11.

> If the page is not a matrix page, the page is segmented either based on area or content. By "segmentation," it is meant that the page is divided into a plurality of regions. The regions may contain one or more links and/or some amount of content. This segmentation facilitates usability as discussed in more detail below.

*Id.* at 4:58–64.

> FIG. 8 is a diagram of the display of a graphical user interface of one embodiment of the invention. The screen is divided into a plurality of cells. In this embodiment, there are fifteen cells that represent navigation options and one messaging cell for displaying messages from the server, the progress or status bar, and a title block. The cells can further be subdivided between the digit keys 1-9 keys which, in this embodiment, represent the primary set of navigation options and the keys designated by letters A-C which represent secondary navigation options and *, 0, and # keys that may be additional navigation options or provide specialized functions. For example, the * key may return the user to the server home site, thereby leaving matrix navigation. The ABC cells will typically hold advertising, and selecting one of those cells will generate a matrix layer with primary navigation cells directed to that advertiser or the product line being advertised. While the interface is designed to be fully accessible with minimal key strokes from a key pad, it is also within the scope and contemplation of the invention to permit selection with a mouse or other pointer device.

*Id.* at 7:65–8:17.

> FIGS. 10*a-g* are a series of matrix layers displayed during an exemplary navigation using one embodiment of the invention. In this example, navigation begins at the Shopping and Products matrix layer and [sic] shown in FIG. 10*a*. A selection of 5 on the 10*a* matrix layer yields an Electronics matrix layer shown in FIG. 10*b*.

Selecting 1 on the keypad when the matrix layer of 10*b* is displayed yields the Audio matrix layer of FIG. 10*c*. By selecting an 8 on the keypad when l0*c* is displayed, the system displays a Receivers matrix layer of FIG. l0*d*, which breaks down receivers into price categories and also provides the option of navigating, in this embodiment, into Consumer Reports industry reports related to receivers. Notably, in FIG. 10*d*, the number of primary navigation options is reduced to 4. Thus, it is not necessary that all layers of the matrix have the same number of cells, nor is it required that all cells have the same size.

*Id.* at 8:37–53.

During reexamination of the '196 Patent, the patentee stated:

Additionally, Claim 1 is distinguishable over HTML 4.0 as the applied reference fails to disclose or suggest that "each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input." The Request identifies assigning an access key to an element, as described in HTML 4.0, as "a separate single navigation option associated with a specific unique input." However, *HTML 4.0 fails to disclose or suggest that an access key is unique to an element. In this regard, more than one access key can be assigned to the same element.* Therefore, HTML 4.0 fails to disclose or suggest that "each cell is a division of the screen and exclusive to a separate single navigation option associated with a specific unique input, as recited in Claim 1.

Accordingly, the '196 Patent holder submits that HTML 4.0 fails to disclose or suggest all the features of Claim 1.

(Resp. to Office Action of July 29, 2010, Doc. No. 124-7 at 13) (emphasis added).

The prosecution histories of related patents are also relevant to construction of the disputed term in the '196 Patent. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) ("When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) ("[P]rosecution disclaimer may arise from disavowals made during the prosecution of

ancestor patent applications. . . . As long as the same claim limitation is at issue, prosecution disclaimer made on the same limitation in an ancestor application will attach.").

During prosecution of the '497 Patent (the '196 Patent is a continuation of a continuation-in-part of the '497 Patent), the patentee stated:

> Even more significant is the utter absence in either of the [prior art] references of the user input device permitting a <u>unique input corresponding to each cell of a current two-dimensional layer of navigation matrix</u>. By way of example, although <u>Jones</u> [(U.S. Patent No. 6,199,098)] teaches that when a mouse is over one of the links and clicks thereon, it opens a node in the hierarchy[,] this fails to teach or suggest the unique input associated with each cell of a current two-dimensional layer of navigation matrix. Moreover, since a mouse click is still a mouse click, wherever it happens to occur, a mouse fails to provide the ability to supply the <u>unique inputs</u> as the term is used by Applicants. When unique inputs are used, traversal of the matrix may be independent of cursor position.

(7/9/2002 Resp. to Office Action, Doc. No. 124-6 at 3–4).

During prosecution of U.S. Patent No. 7,194,698 ("the '698 Patent"), which is a divisional of the '497 Patent, an Interview Summary notes discussion between the patentee and the examiner regarding a "one to one mapping":

> The examiner and applicant discussed language for the claims to further describe that the navigation interface comprises a plurality of cells arranged in a grid-like structure having a *one to one mapping* unique to a key press and wherein data is automatically displayed based on a user's selection history log.

(4/28/2005 Interview Summ., No. 6:10-CV-536, Doc. No. 286-10) (emphasis added). Then, in remarks accompanying an amendment that added the phrase "unique inputs," the patentee explained that "[c]ontent that is formatted for navigation with unique inputs has a one-to-one unique mapping to an input." *Dr. Pepper Final* at 9 (quoting No. 6:10-CV-536, Doc. No. 280-13 at 14) (emphasis omitted). In *Dr. Pepper*, the Court considered this and related prosecution history and concluded that:

> [Plaintiff] did not clearly disavow touchscreens; rather, it defined and limited the simplified navigation interface of the original claim 39.

> [Plaintiff's] introduction of "unique inputs" to distinguish [the] Kaplan
> [reference] did make clear that unique inputs require a one-to-one mapping
> between the user input and the associated content. . . . Thus, there is a one-to-one
> mapping between a unique input and the content it is associated with. [Plaintiff's]
> proposed construction, which only requires "a single input that is sufficient to
> activate a single navigation option," fails to capture this one-to-one mapping. The
> input must activate "only one" navigation option.

*Dr. Pepper Final* at 9.

On balance, *Dr. Pepper* is persuasive because the above-quoted excerpts from the prosecution history contain definitive statements requiring a "one-to-one" relationship between the inputs and the content associated therewith. (*See, e.g.*, Resp. to Office Action of July 29, 2010, Doc. No. 124-7 at 13 ("HTML 4.0 fails to disclose or suggest that an access key is unique to an element. In this regard, more than one access key can be assigned to the same element."); *Omega Eng'g*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added)).

Such an interpretation is also consistent with extrinsic dictionary definitions, submitted by Defendants, that define "exclusive" as meaning "[n]ot shared with others. Independent or single: sole" and that define "separate" as meaning "[e]xisting by itself: independent. Not alike: dissimilar" (*Webster's II New College Dictionary* 391, 1007 (1995), Doc. No. 124-3). Defendants also submit a definition of "exclusive" as meaning "[n]ot divided or shared with others . . . Single or independent; sole" (*American Heritage Dictionary* 473 (2d college ed. 1982), Doc. No. 124-4).

Finally, Plaintiff emphasized at the June 20, 2013 hearing that a matrix layer may contain "empty" cells, that is, cells for which there is no associated navigation option. *See, e.g.,* '196 Patent at Fig. 14. The claim language, however, recites that "each cell is a division of a screen

and exclusive to a separate single navigation option." On balance, the claim language is plain that "each cell" is associated with a navigation option.

The Court further hereby clarifies, as requested by Defendants at the June 20, 2013 hearing, that the Court's construction requires one-to-one correspondence in "both directions." That is, the Court's construction precludes "one-to-many" correspondence and also precludes "many-to-one" correspondence.

The Court therefore hereby construes **"exclusive to a separate single navigation option"** to mean **"there is a one-to-one relationship between cells and navigation options."**

**D.  "unique input" and "associated with a specific unique input"**

| "unique input" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a separate input that actuates only one navigation option" | Defendants do not propose a construction apart from their proposal for the larger term "associated with a specific unique input." |
| **"associated with a specific unique input"** | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction required | "associated with a distinct input that actuates only that navigation option" |

(Doc. No. 114-1 at 1, 3, Doc. No. 114-2 at 4).

The Court has previously construed "unique input" to mean "a separate input that actuates only one navigation option." *Dr. Pepper Final* at 7–10.

At the June 20, 2013 hearing, the Court preliminarily proposed construing "unique input" to mean "a separate input that actuates only one navigation option." Plaintiff was agreeable, but

Defendants responded that the Court should substitute the word "distinct" for the word "separate" to clarify that each input is different from all other inputs.

The Court also proposed construing "associated with a specific unique input" to have its plain meaning. Plaintiff and Defendants had no objection.

(1)  The Parties' Positions

Plaintiff submits that in *Dr. Pepper*, the Court found that the patentee "did not disclaim the use of touchscreens directly or by implication when it disclaimed the use of mice as input devices" (Doc. No. 120 at 15).

Defendants respond that "[u]se of an input device with unique buttons or keys ('inputs') that correspond in a one-to-one relationship with a particular navigation option is fundamental to the '196 Patent" (Doc. No. 124 at 8). Defendants submit that this also constituted a critical feature during prosecution of the ancestor '497 Patent, where the patentee "argued that unique inputs, such as specifically designated keys or buttons, are necessary to correspond to each cell in a one-to-one relationship" (Doc. No. 124 at 9, 11). Further, Defendants cite similar statements by the patentee during reexamination of the '196 Patent, such as that certain "soft key" prior art "fails to disclose or suggest that a soft key or button . . . cannot select more than one field" (Doc. No. 124 at 12 (quoting Resp. to Office Action of July 29, 2010, Doc. No. 124-7 at 25)). Finally, Defendants highlight that in *Dr. Pepper*, the Court noted "the 'one-to-one' nature of a unique input being able to activate only one navigation option" (Doc. No. 124 at 13 (citing *Dr. Pepper Provisional* at 3)) and the "one-to-one mapping between the user input and the associated content" (Doc. No. 124 at 13 (citing *Dr. Pepper Final* at 9)).

Plaintiff replies that the requirement of "one-to-one mapping between the user input and the associated content," noted by *Dr. Pepper* (*Dr. Pepper Final* at 9), means that "a separate input for each cell activates only one navigation option or element" (Doc. No. 127 at 5).

At the June 20, 2013 hearing, Defendants argued that the one-to-one mapping between cells and navigation options is analogous to having different keys for different houses. Defendants urged, using this analogy, that the Court's construction should hold that there is no "master key" that opens multiple houses. Defendants also urged that based on the patentee's statements during prosecution, a touch on a touchpad constitutes a single "input" in the context of the claims (*see* 7/9/2002 Amendment and Resp. to Office Action, Doc. No. 124-6 at 3–4). Plaintiff responded that "distinct" does not appear in the specification or the prosecution history and that the Court in *Dr. Pepper* found that the patentee did not disclaim touchscreens.

(2)  Analysis

This term raises the same issues as the term "exclusive to a separate single navigation option," discussed above. The Court therefore reaches the same conclusions here. Further, the Court finds persuasive the finding in *Dr. Pepper* that the patentee did not disclaim touchscreens. *Dr. Pepper Final* at 9–10 (finding that Plaintiff's "arguments that a mouse click is not a unique input d[id] not disavow touchscreens as unique inputs").

The Court therefore substantially adopts the *Dr. Pepper* construction of "unique input" but changes the word "separate" to "distinct," as Defendants requested at the June 20, 2013 hearing, so as to emphasize that even though the patentee did not disclaim touchscreens, each navigation option must be actuated by a different input. *See Dr. Pepper Final* at 10. To be clear, touches within different areas on a touchscreen may be "unique inputs," just as pressing different keys on a keypad may be "unique inputs." The analysis of whether particular "inputs" are unique

is a factual question for an infringement analysis rather than a legal question for claim construction. *See Markman*, 52 F.3d at 976 ("An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing.") (citation omitted).

To the extent any confusion remains, the Court hereby expressly rejects Defendants' argument that a touch on a touchscreen constitutes the same "unique input" no matter where it occurs on a screen. Instead, "buttons" on a touchscreen, for example, can constitute multiple "unique inputs" just as if they were physical hardware buttons, such as on a keypad. *See Dr. Pepper Final* at 9–10.

Finally, the term "associated with a specific unique input" requires no construction apart from the construction of the constituent term "unique input." *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."); *cf. Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."). At the June 20, 2013 hearing, the parties had no objection to construing this term to have its plain meaning.

The Court accordingly hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"unique input"** | **"a distinct input that actuates only one navigation option"** |
| **"associated with a specific unique input"** | **Plain meaning** |

### E.  "to navigate to the web page"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction required | "to navigate to the web page used to generate the sister site" |

(Doc. No. 114-1 at 4, Doc. No. 114-2 at 7).

At the June 20, 2013 hearing, the Court provided the parties with the following preliminary proposed construction: "to navigate to the website used to generate the sister site." Defendants were agreeable, but Plaintiff responded that the Court should substitute the phrase "that corresponds to" for the phrase "used to generate."

(1)  The Parties' Positions

Plaintiff argues that "[b]ecause the construction proposed by the Defendants is unnecessary, unsupported, and unhelpful to a jury, this Court should reject construing the term and hold that it will have its plain and ordinary meaning" (Doc. No. 120 at 17). Plaintiff also argues that "[t]he claim language does not say anything about how the sister site is made, much less require that the general use web site *generates* the sister site" (Doc. No. 120 at 17). Plaintiff urges that creating a sister site by "transcoding" a website is a non-limiting feature of a particular embodiment and should not be imported into the claims (Doc. No. 120 at 18). To the contrary, Plaintiff argues, "[t]he specification of the '196 Patent discusses maintaining separate databases of sister site web pages corresponding to the desktop webpages as an alternative to converting a desktop website to create a sister site" (Doc. No. 120 at 19). Finally, Plaintiff submits that

Defendants have failed to cite any portion of the specification to support their proposal (Doc. No. 120 at 19).

Defendants respond, first, that "the reference to 'the web page' in the claim language is clearly tied to the antecedent use of 'web page' in the immediately preceding claim limitation of every independent claim" (Doc. No. 124 at 20). Second, Defendants respond that the plain language of the claims, as well as the patentee's statements during reexamination, demonstrate that the web page is used to generate the sister site (Doc. No. 124 at 20–21). That is, "Defendants' construction simply clarifies the fact that the web page referred to in this claim term is the same web page used to generate the sister site" (Doc. No. 124 at 22).

Plaintiff replies that none of the claims of the '196 Patent recites transcoding of a website, that certain Figures in the '196 Patent illustrate manual creation of sister sites, and that the specification does not specify whether the creation of sister sites is manual or automated (Doc. No. 127 at 7).

At the June 20, 2013 hearing, Plaintiff argued that the phrase "used to generate" in the Court's preliminary proposed construction is unclear and would cause confusion. Plaintiff proposed that substituting the phrase "that corresponds to" would make clear that there is a relationship between the claimed webpage and the sister site.

(2)  Analysis

Claim 1 is representative and recites (emphasis added):

1.  A method of navigating the Internet, comprising:
    displaying on-line content accessed via the Internet, *the on-line content reformatted from a webpage in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site, the sister site including a portion or a whole of content of the web page reformatted to be displayed and navigable through a simplified navigation interface* on any one of a television, web appliance, console device, handheld device, wireless device or cellular phone, the simplified navigation interface displayed in a form of a two-

dimensional layer of cells from a plurality of layers and a plurality of cells, the two-dimensional layer in a form of a navigation matrix, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer;

displaying a hyperlink on the sister site *to navigate to the web page*, or displaying a hyperlink on the web page to navigate to the sister site;

receiving a user selection of one of the navigation options;

forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;

receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option; and

manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.

The claim itself thus recites that the sister site is generated from an HTML web page. Further, the recital of "the web page" in the term "to navigate to the web page" presumably refers to the same "webpage"[3] used to generate the sister site. *See, e.g., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356–57 (Fed. Cir. 1999) ("It is clear from the language of the claim itself that the term 'a discharge rate' in clause [b] is referring to the same rate as the term 'the discharge rate' in clause [d].") (square brackets in original); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) (citing *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'")); *cf. Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.").

---

[3] The parties have not identified any distinction between "web page" and "webpage," so the Court treats the two terms as synonyms.

The proper construction of the term is thus evident from the face of the claim except that the "sister site" is generated from a "web site," not strictly a particular "web page," as discussed regarding the term "sister site," above. *See Dr. Pepper Final* at 6.

The Court therefore hereby construes **"to navigate to the web page"** to mean **"to navigate to the website used to generate the sister site."**

### F.  "to navigate to the sister site"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction required | "to navigate to the sister site generated from the web page" |

(Doc. No. 114-1 at 4, Doc. No. 114-2 at 8).

At the June 20, 2013 hearing, the Court provided the parties with the following preliminary proposed construction: "to navigate to the sister site generated from the website." Defendants were agreeable, but Plaintiff responded that the Court should substitute the phrase "corresponding to" for the phrase "generated from."

Plaintiff argues this term together with the term "to navigate to the web page," discussed above (*see* Doc. No. 120 at 16–19; Doc. No. 127 at 6–8). Defendants respond that "[t]he 'sister site' referred to in this claim term is the sister site that was generated through the reformatting of the original web page" (Doc. No. 124 at 23).

The present disputed term raises the same issues as the term "to navigate to the web page," discussed above. The Court therefore reaches the same conclusions here.

The Court accordingly hereby construes **"to navigate to the sister site"** to mean **"to navigate to the sister site generated from the website."**

**G. "to generate a sister site"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction required | "to bring a web site[4] in an XML format into existence by a machine reformatting the HTML format web page" |

(Doc. No. 114-1 at 5; Doc. No. 114-2 at 13–14).

The Court has previously found no construction necessary for the larger term "the [first/online] content reformatted from a web page in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site." *Dr. Pepper Final* at 10–11.

At the June 20, 2013 hearing, the Court provided the parties with the following preliminary proposed construction: "to bring a website in an XML format into existence by reformatting the HTML format web page." Plaintiff was agreeable, but Defendants responded that the construction should require a "machine."

(1) The Parties' Positions

Plaintiff argues that Defendants' proposal of requiring a "machine" lacks support in the specification and would exclude preferred embodiments, such as the embodiment that maintains a database of sister sites (Doc. No. 120 at 20–21).

Defendants respond that "[t]he specification only teaches machine reformatting," as illustrated in Figure 3 (Doc. No. 124 at 16). Defendants argue that because sister sites can be generated in advance and then stored, "[t]here is nothing inconsistent between Defendants' construction, which requires machine reformatting, and maintaining a database of sister site web

---

[4] Defendants sometimes refer to "website" rather than "web site." The parties appear to agree that the terms are interchangeable.

pages" (Doc. No. 124 at 17). Defendants further argue that during prosecution, the patentee distinguished manual conversion of HTML pages into XML pages (Doc. No. 124 at 18).

Plaintiff replies that "Defendants ignore several preferred embodiments showing the manual reformatting of a sister site" and that during prosecution "there was no disavowal of manual reformatting, much less a clear and unmistakable one" (Doc. No. 127 at 8–9). Plaintiff notes that in the prosecution history of the parent '845 Patent cited by Defendants, the claim term at issue was "transcoding," not "generate" (Doc. No. 127 at 9). Plaintiff urges that "there was no disavowal of manual reformatting and, at most, any purported disclaimer would relate only to the 'transcoding' limitation, which is *not* recited in any claims of the '196 Patent . . . ." (Doc. No. 127 at 9).

At the June 20, 2013 hearing, Defendants reiterated that the specification contains no teaching of manual formatting. Plaintiff responded that manual generation is illustrated by Figures 2B, 9A–D, 10A–G, 11, 12A, and 12B.

(2)  Analysis

The specification discloses:

In one embodiment, the sister site is traditional HTML pages converted to a matrix format to permit matrix navigation. *This conversion may be done using an XML transcoding* or any other suitable language.

Content partners may maintain a database of sister site web pages corresponding to the pages in the general use site. Alternatively, content partners may provide a facility for *converting web pages on the fly to the sister site format*.

'196 Patent at 2:52–59 (emphasis added).

FIG. 3 is a flow diagram of conversion of standard HTML pages to a sister site format in one embodiment of the invention. *A hypertext markup language (HTML) page 40 is transcoded by a transcoder 30* to yield, for example, an XML page 42 to which a document type definition (DTD) 38 is applied. The DTD 38 specifies the rules for the structure of the resulting XML document. The XML page is then reformatted using extensible style language (XSL) 34 to

corresponding format data 32. XSL is not currently supported by all standard browsers. Thus, after formatting, the XML document is translated to an extensible hypertext markup language (XHTML) document for subsequent display by a client side browser on display 52. Alternatively, the XML page may have a cascading style sheet (CSS) applied to achieve the desired format. One advantage of the CSS is that it is supported by standard browsers. After application of the CSS, the resulting formatted page can be displayed by the client browser on display 52.

*Id.* at 3:21–37 (emphasis added).

Defendants have also cited Figure 3, which illustrates "transcoder 30." Figure 3 is reproduced here:



**FIG. 3**

As to the prosecution history, Defendants have emphasized that "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc., v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *accord Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations because

the public has a right to rely on such definitive statements made during prosecution.") (citation and internal quotation marks omitted); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1289 (Fed. Cir. 2009) (en banc) ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating . . . whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.") (citation and internal quotation marks omitted).

During prosecution of the parent '845 Patent, the patentee distinguished the "Heinemann" reference as disclosing "generating manually an XML document to represent data roughly equivalent to an HTML document" and as "not teach[ing] transcoding HTML page into an XML page or applying a document typed [sic] definition (DTD) to the XML page" (7/15/2003 Appeal Br., Doc. No. 124-10 at 9–10).

On one hand, the specification and the prosecution history discuss conversion in the context of machine transcoding, as opposed to manual conversion by a person. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."); *see also Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005) (construing term "board" to mean "wood cut from a log" in light of the patentee's consistent usage of the term; noting that patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history."). Also, the Figures cited by Plaintiff at the June 20, 2013 hearing (Figures 2B, 9A–D, 10A–G, 11, 12A, and 12B) illustrate sister sites but do not illustrate manual generation of a sister site.

On the other hand, the claims themselves only refer to "generat[ing]," not transcoding, and nothing in the specification or prosecution history is inconsistent with using the content of a website to create a sister site manually, rather than by machine. Again, the above-quoted prosecution history pertained to the term "transcoding," not "generat[ing]."

On balance, Defendants' proposal would improperly import a limitation into the claims and is hereby expressly rejected. *See Innova/Pure Water*, 381 F.3d at 1117; *see also Phillips*, 415 F.3d at 1323. Nonetheless, as Defendants urge and as discussed above regarding the term "to navigate to the web page," the sister site is generated from an HTML format website. *See Dr. Pepper Final* at 6–7. The Court therefore modifies its preliminary proposed construction to replace "web page" with "website."

The Court accordingly hereby construes **"to generate a sister site"** to mean **"to bring a website in an XML format into existence by reformatting the HTML format website."**

## H.  "reformatted"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction required | "reformatted by a machine transcoder" |

(Doc. No. 114-1 at 6, Doc. No. 114-2 at 15).

The Court has previously found no construction necessary for the larger term "the [first/online] content reformatted from a web page in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site." *Dr. Pepper Final* at 10–11.

At the June 20, 2013 hearing, the Court preliminarily proposed construing this disputed term to have its plain meaning. Plaintiff was agreeable. Defendants had no objection to such a

construction apart from their arguments as to the related term "to generate a sister site," discussed above.

The Court therefore hereby construes **"reformatted"** to have its **plain meaning**.

## I. "the two-dimensional layer in a form of a navigation matrix"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction required | "the layer is at least two rows and at least two columns and is formed in a rectangular arrangement" |

(Doc. No. 114-1 at 5, Doc. No. 114-2 at 10–11).

At the June 20, 2013 hearing, the Court provided the parties with the following preliminary proposed construction: "the layer includes at least two rows and at least two columns." Defendants were agreeable, and Plaintiff responded that it would be agreeable if the Court made clear that the rows and columns may be irregular. Plaintiff noted its concern that although the Court's preliminary proposed construction omits the "rectangular arrangement" phrase proposed by Defendants, the construction might nonetheless be read to require a regular, uniform distribution of rows and columns. Plaintiff cited Figures 2C, 10F, 13, and 14 as illustrating irregular segmentation. Plaintiff agreed, however, that a single column would not qualify as "two-dimensional." Defendants responded that they were not contending that there must be an equal number of rows and columns or an even distribution of rows and columns. Defendants submitted that the Court's preliminary proposed construction is clear and does not warrant Plaintiff's concern.

Claim 1 is representative and recites, in relevant part (emphasis added): "the simplified navigation interface displayed in a form of a *two-dimensional layer of cells* from a plurality of layers and a plurality of cells, *the two-dimensional layer in a form of a navigation matrix*, each

cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input . . . ."

As the parties have agreed, the claimed "two-dimensional" matrix is something more than a single row or a single column. Defendants' proposal of at least two rows *and* at least two columns is appropriate because, for example, multiple "columns" arranged in a single, one-dimensional row would not be "two-dimensional."

On balance, as Defendants appeared to agree at the June 20, 2013 hearing, the terms "two-dimensional" and "matrix" do not require a rectangular arrangement. Particularly in light of the disclosure of "irregular segmentation" (*see* '196 Patent at 1:58, 3:16, Fig. 2C) and that cell boundaries might not be shown (*see* '196 Patent at 3:2–11, 4:67–5:3), a person of ordinary skill in the art would understand that a rectangular configuration is merely a feature of certain preferred embodiments. Defendants' proposal of "a rectangular arrangement" would improperly import a limitation into the claims and is hereby expressly rejected. *See Innova/Pure Water*, 381 F.3d at 1117; *see also Phillips*, 415 F.3d at 1323.

The Court further hereby clarifies, as requested by Plaintiff at the June 20, 2013 hearing, that the Court's construction allows for "irregular segmentation," that is, non-uniform arrangement of rows and columns, and that cells may be of irregular size and shape.

The Court therefore hereby construes **"the two-dimensional layer in a form of a navigation matrix"** to mean **"the layer includes at least two rows and at least two columns."**

**J.  "manipulating a region of the screen"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction required | "manipulating a cell" |

(Doc. No. 114-1 at 4–5, Doc. No. 114-2 at 10).

The Court has previously found no construction necessary as to the larger term "manipulating a [region/selected region] of the screen for viewing and zooming and/or scrolling of the displayed on-line content." *Dr. Pepper Final* at 12–13.

Plaintiff argued in its opening brief that "the specification and claims do not limit a region to a cell" (Doc. No. 120 at 26). Defendants' response brief does not address this term, and the parties did not address this term in their joint statement regarding the terms to be argued at the June 20, 2013 hearing or at the hearing itself. The Court therefore assumes that the parties no longer seek construction of this term.

The Court accordingly does not construe the term.

## IV. CONCLUSION

For the reasons stated, the Court adopts the constructions set forth above.

**It is SO ORDERED**.

**SIGNED this 11th day of July, 2013.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

# Attachment A

| Term | Court's Final Construction |
|---|---|
| 1. "web page" and "webpage" | "a document on an Internet website" |
| 2. "sister site" | "a site that provides for navigation of a related website using a simplified navigation interface" |
| 3. "exclusive to a separate single navigation option" | "there is a one-to-one relationship between cells and navigation options" |
| 4. "unique input" | "a distinct input that actuates only one navigation option" |
| 5. "associated with a specific unique input" | Plain meaning |
| 6. "to navigate to the web page" | "to navigate to the website used to generate the sister site" |
| 7. "to navigate to the sister site" | "to navigate to the sister site generated from the website" |
| 8. "to generate a sister site" | "to bring a website in an XML format into existence by reformatting the HTML format website." |
| 9. "reformatted" | Plain meaning |
| 10. "the two-dimensional layer in a form of a navigation matrix" | "the layer includes at least two rows and at least two columns" |